UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADHID MIRI, ET AL.,

       Plaintiffs,

v.

ANDY DILLON, ET AL.,

       Defendants.

_____/

Case No. 11-15248

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND TO APPOINT CLASS COUNSEL [28]**

This is a civil rights lawsuit brought pursuant to 42 U.S.C. § 1983. Plaintiffs Adhid Miri and The Exchange, Inc., on behalf of themselves and all other similarly situated legal persons, allege that Defendants violated their Fourth Amendment rights by following the Michigan Department of Treasury's uniform practice during the relevant time period and entering their property without a judicially authorized warrant and seizing their property in satisfaction of an alleged tax debt. This matter comes before the Court on Plaintiffs Adhid Miri's and The Exchange, Inc.'s motion for class certification and to appoint class counsel. Plaintiffs identify the following putative class:

> All taxpayers subjected to a non-consensual search and/or seizure of their property pursuant to a Michigan Department of Treasury Warrant from December 1, 2008 to December 1, 2011.

(Pls.' Mot., at iii.)

Plaintiffs' motion for class certification is GRANTED IN PART. The class, as defined by the Court in this Opinion and Order, will be certified for liability purposes only. *See* Fed.

R. Civ. P. 23(c)(4); *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004); 2 W. Rubenstein, Newberg on Class Actions § 4:54, pp. 206-208 (5th ed. 2012). This Court also appoints Plaintiffs' counsel to serve as Co-Lead Class Counsel.

## I.  Facts

### A.  Plaintiffs

The named Corporate Plaintiff, The Exchange, Inc., is a Michigan corporation doing business as "Copper Canyon Brewery" ("Copper Canyon"). The named Individual Plaintiff, Adhid Miri ("Miri") is the sole shareholder and President of Copper Canyon. (Pls.' Mot., Ex. 2, Miri 9/18/12 Dep. at 26.) Miri, a native of Iraq, is highly educated and an experienced businessman. He holds multiple degrees, including a Ph.D in organic chemistry. He has also served as a professor at multiple international universities, including King's College at the University of London. (*Id.* at 8-9.) Miri came to the United States in 1981, founded a video rental store chain in 1982 that was subsequently sold for a profit in the late 1980's. (*Id.* at 7, 10, 13-15.) Next, he opened a chain of coffee stores that were subsequently sold to Caribou Coffee in 1995. (*Id.* at 15-16.) Miri did not owe any delinquent taxes on any of his video or coffee stores. He used his profits from the sale of those businesses to plan and fund the opening of Copper Canyon. (*Id.* at 15-18.) Copper Canyon opened in 1999 and remains open today. (*Id.* at 18, 20.)

Copper Canyon is a 9,600 square foot brew pub with an 800 square foot outdoor deck on 1.84 acres. (*Id.* at 27, 60-61.) Of the 9,600 square feet, 7,500 square feet is open to or in view of the public. The remaining 2,100 square feet, housing the kitchen, an office, storage space, and the liquor storage room, is private. (*Id.* at 60-61, 69, 113.) Using 2011

as a reference point, Copper Canyon employed about five full-time employees and ten part-time employees; and, at its peak, had revenues as high as $2.1 million. (*Id.* at 26, 29.)

## B.  Copper Canyon's History With Michigan's Treasury Department

Copper Canyon fell behind on its tax obligations to the State of Michigan, namely sales tax.  At one time, it took advantage of an amnesty program, borrowing $100,000.00 to pay down its tax obligations, and also entered into various payment plans for delinquent taxes. (*Id.* at 35-37, 52, 112.)

Leading up to the events that give rise to this lawsuit, Copper Canyon again owed sales taxes to the Michigan Treasury. (*Id.* at 34-35.)  Defendant Manuel (Rick) Rodriguez ("Rodriguez") was the Michigan Treasury Department Warrant Officer charged with collecting the debt owed by Copper Canyon. (Pls.' Mot., Ex. 3, Rodriguez 7/19/12 Dep. at 18-19.)  Rodriguez visited Copper Canyon on a couple of occasions; but always met with Miri in publicly accessible space, during business hours, for very short periods of time, and never wore a badge or uniform that would identify him as a Treasury agent. (Miri Dep. at 50-52.)  On January 7, 2010, Copper Canyon owed back taxes but Miri was working on paying its tax debt.  To that end, he had contacted 13 or 14 mortgage companies, institutions, banks, hard money lenders, and soft money lenders and informed Rodriguez that he was trying his best to come up with the money. (*Id.* at 112.)

## C.  January 7, 2010 Treasury Department Search and Seizure

On January 7, 2010, with a Treasury Warrant issued without judicial approval, Rodriguez and other individuals -- eight Treasury employees, two on-duty Michigan State Police Officers, and one locksmith -- arrived at Copper Canyon a half-hour before it was scheduled to open and proceeded to search and seize Plaintiffs' property. (Miri Dep. at 54,

3

66-67; Rodriguez Dep. at 122; Pls.' Mot., Ex. 4, Copper Canyon 10/30/09 Treasury Warrant.)  In front of waiting customers, Rodriguez and two uniformed officers met Miri at the entrance to Copper Canyon, told Miri that the Treasury Department was seizing the property, changing the locks, taking his licenses, and shutting Copper Canyon down. Rodriguez demanded to see the private office, the safe, and the liquor room.  (Miri Dep. at 45-46, 54-55, 67-72.)  All of those areas are locked, private and not accessible to the public or Treasury employees.  (*Id.* at 69-72, 76, 79-80, 114-115.)  Miri was visibly shaken.  (Pls.' Mot., Ex. 5, 1/12/10 Post Warrant Report.)  The scene was chaotic.  Miri attempted to get Rodriguez to explain what was going on while also trying to ease the concerns of his employees.  (Miri Dep. at 54, 68.)  After speaking with his attorney, Miri left Copper Canyon, but Rodriguez and the other Treasury agents remained inside Copper Canyon. Hours later, around 3:00 p.m., Miri returned with bankruptcy papers that his attorney had filed in order to halt the seizure.  When he returned, the front door to Copper Canyon was locked.  When he went to the back of the building, he saw Rodriguez with a couple other people. They had seized all the liquor from Copper Canyon, the licenses off the wall, and the cash from the safe.  (*Id.* at 79-80.)  After Miri showed them the bankruptcy papers, they returned the seized liquor and licenses to him and gave him the new set of keys to Copper Canyon because the locksmith had changed the locks.  (*Id.* at 80.)  Plaintiffs allege damages they claim are the result of the Michigan Treasury Department's unlawful search and seizure practice.  (Mot. at 5.)

### D.  Treasury's Department-Wide Warrant Policies and Procedures

On January 7, 2010, when the Treasury Warrant was executed at Copper Canyon, Rodriguez was acting in accordance with the Treasury Department's established practices

4

and procedures for procuring and executing Treasury Warrants as reflected in Treasury Bulletin BC-49020, titled "Tax Warrants, Guidelines for Collection by Seizure and Sale of Taxpayer's Assets," a policy that had been in effect since February 1, 2003. (Pls.' Mot., Ex. 6, BC-49020; Ex. 3, Rodriguez Dep. at 41, 55, 83-84; Ex. 7, Howard 9/17/12 Dep. at 58, 67.) All Warrant Officers followed the same policy, practice, and protocol described in Bulletin BC-49020 when obtaining and executing a Treasury Warrant. (Pls.' Mot., Ex. 8, Defs.' Resp. to Pls.' 1st Set of Interrogs. Nos. 12, 16.) The standard procedure for obtaining a Treasury Warrant did not require judicial authorization. (Pls.' Mot., Ex. 7, Howard Dep. at 59.) Defendants produced a list of 162 Treasury Warrants that were issued and executed under the procedures described in Bulletin BC-49020 since December 1, 2008. (Pls.' Mot., Ex. 7, Howard Dep. at 59-60, 63; Ex. 9, List of Taxpayers subject to non-consensual warrant execution; Defs.' Ex. F, Howard Aff., ¶ 2.)

## 1. Warrant Request Process

The warrant request process begins when a tax debt is referred to a Warrant Officer like Defendant Rodriguez. By the time a debt reaches the Warrant Officer, collection efforts have already been attempted. The Warrant Officer also attempts to collect the tax debt and ultimately determines whether to pursue a Treasury Warrant. (Pls.' Mot., Ex. 7, Howard Dep. at 16, 18; Ex. 6, Bulletin BC 49020 at 6-7.) A warrant request originates with a standardized fill-in-the-blank, computer-generated, memo-style form, titled "Pre-Warrant Report," that is completed by the Warrant Officer. (Pls.' Mot., Ex. 10, Copper Canyon 10/01/09 Pre-Warrant Rpt.; Ex. 3, Rodriguez Dep. at 24-25, 36; Ex. 6, Bulletin BC 49020 at 21-23; Ex. 7, Howard Dep. at 20-21.) The completed Pre-Warrant Report is accompanied by an electronic approval mechanism which logs the necessary approvals

5

and is sent up the Treasury's chain of command.  (Pls.' Mot., Ex. 3, Rodriguez Dep. at 37-39; Ex. 6, Bulletin BC 49020 at 20; Ex. 7, Howard Dep. at 20-23.)

Warrant requests or Pre-Warrant Reports are first sent to the Warrant Officer's supervisor, then to a manager, the assistant administrator, administrator of the collections division, and finally to the Director of the Financial Services Bureau for ultimate approval. During the initiation and execution of the Copper Canyon Treasury Warrant, Tyson Howard was the head of field enforcement and sent warrant requests to the administrator of the collections division.  (Pls.' Mot., Ex. 3, Rodriguez Dep. at 25, 37-38; Ex. 7, Howard Dep. at 16, 23-30.)  Each individual in the review process examines the same basic information, i.e., the Pre-Warrant Report and public documents, looking for discrepancies.  (Howard Dep. at 23-30.)  While performing these duties, none of these Treasury employees are acting as judges, attorneys, or court officers, and no judge or lawyer is consulted throughout the process described in Bulletin BC 49020.  (Howard Dep. at 24-31; Rodriguez Dep. at 38-41, 45.)  After the Director approves the Pre-Warrant Report, the final Treasury Warrant is signed by the Director, not a judge or lawyer or officer of the judiciary.  (Pls.' Mot., Ex. 3, Rodriguez Dep. at 99; Ex. 4, 10/30/09 Treasury Warrant signed by Mary MacDowell, Director, Financial Services Bureau; Ex. 7, Howard Dep. at 30-31.)  The signed Treasury Warrant is returned to the Warrant Officer who then executes the Warrant.  The non-judicially authorized warrant generated under Michigan's Treasury Department's standard procedure, as described in Bulletin BC 49020, is the only document used to claim a right of entry onto the taxpayer's property.  (Pls.' Mot., Ex. 3, Rodriguez Dep. at 43, 85; Ex. 7, Howard Dep. at 41-42; Ex. 6, Bulletin BC 49020 at 6-8.)

## 2.  Warrant Execution Process

After receipt of the signed Treasury Warrant, the Warrant Officer is in charge of coordinating the roster of team members who will execute the Warrant, setting the date for its execution, and handling the post-execution public auction of the taxpayer's seized property.  (Pls.' Mot., Ex. 3, Rodriguez Dep. a 33-34, 48.)  After arrival at the place designated by the Treasury Warrant to be searched, the law enforcement officers accompanying the Warrant Officer first secure the premises.  (Pls.' Mot., Ex. 7, Howard Dep. at 38-39.)  It is then standard procedure to serve the Warrant on the taxpayer.  (Pls.' Mot., Ex. 3, Rodriguez Dep. at 45; Ex. 6, Bulletin BC 49020 at 27; Ex. 7, Howard Dep. at 39-40.)  Next, the corporate taxpayer's premises are searched by Treasury Agents who identify, tag, and inventory assets owned by that corporate or business entity.  (Pls.' Mot., Ex. 7, Howard Dep. at 41.)  The locks are changed thus securing and seizing the real property.  (Pls.'s Mot., Ex. 3, Rodriguez Dep. at 46; Ex. 7, Howard Dep. at 44.)

After the tagging and inventorying of assets is completed, the assets are prepared for auction; and, if necessary, special arrangements are made for items like perishable goods or liquor.  The taxpayer is given a period of redemption -- no less than ten days -- and then a public auction is advertised and held.  The taxpayer's seized assets are sold to satisfy the alleged debt owed to Michigan's Treasury.  All of this is initiated and executed without approval by a judge, judicial officer, or lawyer.  (Pls.' Mot., Ex. 7, Howard Dep. at 41, 47-48.)

### E.  Plaintiffs' Putative Class Action Complaint

On November 29, 2011, Plaintiffs filed a putative class action complaint.  It asserts a civil rights claim, brought pursuant to 42 U.S.C. § 1983, alleging that, as a result of the standardized policy, practice, and procedure of Michigan's Department of Treasury from

December 1, 2008 to December 1, 2011, the putative class members' Fourth Amendment rights protecting against unreasonable searches and seizures were violated.  In the motion presently before the Court, Plaintiffs argue that it is the standardized process of obtaining and executing a Michigan Treasury Warrant without judicial authority during this time period that gives rise to this action's suitability for class certification under Federal Rule of Civil Procedure 23.  Defendants disagree and oppose Plaintiffs' motion for class certification.


## II.    Analysis

The sole issue before the Court is whether certification of a class is consistent with Federal Rule of Civil Procedure 23.  Plaintiffs assert that  Defendants' uniform practice during the relevant time period of securing and using a non-judicially authorized warrant to enter onto and seize the putative class members' property to satisfy an alleged tax debt violated their Fourth Amendment rights.  In support of their claim of a Fourth Amendment violation, Plaintiffs cite *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977), and *Bollini v. Bolden*, No. 08-14608, 2010 WL 1494562, **6-9 (E.D. Mich. Apr. 14, 2010).

In *G.M. Leasing*, the IRS had determined that G.M. Leasing was an alter ego for George Norman, G.M. Leasing's general manager, and sought to "levy upon and seize automobiles titled in [G.M. Leasing]'s name in partial satisfaction of [tax] assessments against Norman." 429 U.S. at 343-44.  Thus, IRS agents, without a warrant, seized several automobiles parked in open areas and then went to the taxpayer's office "to levy on property subject to seizure, including the building itself." 429 U.S. at 344.  "[A]gents, acting without a warrant, and with the assistance of locksmiths and the equipment of a private van and storage firm, entered the [premises] and removed its remaining contents, including

8

furnishings and books and records.  An inventory was made of the property so seized."  *Id.*
at 346.

G.M. Leasing subsequently filed suit against the government, alleging that it "was not
an alter ego of Norman, and that the levy upon its premises and the contents violated the
Fourth Amendment."  *Id.*  After a bench trial, the district court entered judgment in favor of
G.M. Leasing.  *Id.* at 347-48.  On appeal, the Tenth Circuit reversed, ruling that G.M.
Leasing was Norman's alter ego and there was no Fourth Amendment violation because
the refusal to pay delinquent taxes authorized the federal government "to collect the tax by
levy, and this included the power of 'seizure by any means;'" and that the government was
"acting pursuant to statute and did not commit an illegal search."  *Id.* at 348-49.

The Supreme Court granted certiorari "limited to the Fourth Amendment issue arising
in the context of seizures of property in partial satisfaction of income tax assessments."  *Id.*
at 340.  It rejected the government's argument "that there is a broad exception to the Fourth
Amendment that allows warrantless intrusions into privacy in the furtherance of
enforcement of the tax laws."  *Id.* at 354.  Distinguishing between the IRS agents' seizure
of G.M. Leasing's automobiles in open spaces and the seizure of its property from its
business premises, the Court explained that "[i]t is one thing to seize without a warrant
property resting in an open area or seizable by levy without an intrusion into privacy, and
it is quite another thing to effect a warrantless seizure of property, even that owned by a
corporation, situated on private premises to which access is not otherwise available for the
seizing officer."  *Id.*  It observed that "one of the primary evils intended to be eliminated by
the Fourth Amendment was the massive intrusion on privacy undertaken in the collection
of taxes pursuant to general warrants and writs of assistance."  *Id.* at 355.  The *G.M.*

9

*Leasing* Court reasoned that "[t]he intrusion into [G.M. Leasing]'s office is . . . governed by the normal Fourth Amendment rule that except in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a search warrant" and held that "the warrantless entry into [G.M. Leasing]'s office was in violation of the commands of the Fourth Amendment."  *Id.* at 359 (internal quotation marks and citation omitted).

In *Bollini*, the court reasoned that, although the Michigan Treasury Department and State Trooper defendants in that case were "state officials collecting a state tax liability" rather than "federal agents collecting an IRS debt," their "entry on to Plaintiffs' property to tag and seize Plaintiffs' assets in satisfaction of a tax debt constituted a search protected by the guarantees of the Fourth Amendment."  2010 WL 1494562 at *6.  Relying on the Supreme Court's decision in *G.M. Leasing* and the Sixth Circuit's recognition of the holding in *G.M. Leasing* in *Sachs v. United States*, 59 F. App'x 116, 119 (6th Cir. 2003), the *Bollini* court held that the state official defendants' seizure of Plaintiffs' assets "without a judicially authorized warrant" violated the plaintiffs' Fourth Amendment rights and rejected the defendants' qualified immunity argument that "these rights were not clearly defined" at the time of the seizure.  *Id.* at *6, 9.

Plaintiffs here contend that, because the challenged the Michigan Treasury Department's policy, practice, and procedure of securing Michigan Department of Treasury Warrants, without judicial authority, and using them to enter private property, search for, and seize taxpayer assets is uniform and susceptible to common proof establishing liability, the Fourth Amendment claim asserted by the putative class against Defendants is well suited for class certification and may be maintained as one.  Plaintiffs further argue that the

10

proposed class (1) satisfies Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation; and (2) certification is appropriate under Rule 23(b)(1), (b)(2), or (b)(3).  Invoking these Rule 23 provisions, Plaintiffs move this Court to certify a Plaintiff Class consisting of:

> All taxpayers subjected to a non-consensual search and/or seizure of their property pursuant to a Michigan Department of Treasury Warrant from December 1, 2008 to December 1, 2011.

Defendants oppose class certification for the following reasons:  (1) the class period Plaintiffs propose includes the time period between January 1, 2011 and December 1, 2011 when searches and seizures were conducted pursuant to judicially-authorized orders; (2) Plaintiffs' claims for money damages are barred by the Eleventh Amendment; (3) Plaintiffs' request for injunctive relief is moot since Michigan's Treasury Department discontinued the challenged policy, practice, and procedure of using non-judicially authorized Warrants in July 2010 and replaced it in January 2011 with an official policy requiring a judicial order prior to executing a tax warrant; (4) Plaintiff Miri is not a suitable class representative because he is not similarly situated to other putative class members; (5) Defendant Dillon had no personal involvement in the challenged policy or any challenged search or seizure because he was not appointed State Treasurer until January 2011; (6) Defendant Rodriguez participated in some but not all of the challenged warrant executions during the relevant time period; and (7) the putative class members' alleged Fourth Amendment violations present individual facts that predominate over common issues and make unified class treatment of Plaintiffs' claims inappropriate.

For the reasons discussed below, the Court will grant Plaintiffs' motion in part and certify the class defined below for liability purposes only.

11

All persons, businesses, or entities who or which have been subjected to non-consensual, non-judicially approved search and/or seizure of their property carried out by agents or other persons acting on behalf of or at the direction of the Michigan Department of Treasury within the applicable statute of limitations period where such persons failed to secure judicially authorized warrants permitting such search and/or seizure.[1]

The Court will also grant the request in Plaintiffs' motion asking it to appoint Plaintiffs' counsel to serve as Co-Lead Class Counsel.

### 1. Class Action Requirements

"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011), The party seeking certification has the burden of showing that the requirements of Rule 23(a) and 23(b) are satisfied. *Id.* This is not "a mere pleading standard." *Id.* at 2551. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule," and, before granting class certification, the Court must be "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (internal quotation marks and citations omitted).

In addition, "[b]efore a court may certify a class under Rule 23, the definition of the class must be sufficiently precise to allow the court to determine administratively whether a particular individual is a member of the proposed class." *Arlington Video Prods., Inc. v. Fifth Third Bancorp*, No. 11-4077, 2013 WL 560635, *12 (6th Cir. Feb. 14, 2013). "'[D]istrict courts have broad discretion to modify class definitions.'" *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539 (6th Cir. 2012)).

### a. Rule 23(a)

---

[1] "'[D]istrict courts have broad discretion to modify class definitions.'" *Arlington Video Prods., Inc. v. Fifth Third Bancorp*, No. 11-4077, 2013 WL 560635, *12 (6th Cir. Feb. 14, 2013) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539 (6th Cir. 2012)).

To satisfy Rule 23(a)'s requirements, Plaintiffs must show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law and fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  As the Supreme Court observed in *Wal-Mart*, "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.  In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.   Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.   The Rule's four requirements -- numerosity, commonality, typicality, and adequate representation -- effectively limit the class claims to those fairly encompassed by the named plaintiffs' claims." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks and citations omitted).

## (1) Numerosity

The concern under Rule 23(a)(1) is practicality and not mathematical certainty.  *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (observing that "while there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement."). The "impracticability of joinder must be positively shown, and cannot be speculative." *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005).

The numerosity requirement is satisfied.  Plaintiffs' proposed class is easily identifiable as Defendants have already produced a list of over 150 putative class members, a number

13

sufficiently large enough to render joinder impractical.  (Pls.' Mot., Ex. 9, List; Ex. 12, 6/08/12 Order granting in part Pls.' motion to compel [Doc. # 19].)  Defendants concede that there were 162 non-consensual seizures performed pursuant to an official policy of Michigan's Department of Treasury during the applicable statute of limitations period. (Defs.' Resp. at 9, 10.)  In response, Defendants raise an Eleventh Amendment argument -- because each challenged seizure was performed pursuant to an official policy of Michigan's Treasury Department, Plaintiffs' Fourth Amendment claims are effectively against the State of Michigan and thus barred by Eleventh Amendment.  This argument does not address the numerosity requirement.  The same is true of Defendants' additional arguments that not every Defendant may have been personally involved in each of the 162 challenged seizures.

### (2) Commonality

As the Sixth Circuit recently recognized, Rule 23(a)'s commonality prerequisite requires "that there is a single factual or legal question common to the entire class." *Arlington Video*, 2013 WL 560635 at *14 (internal quotation marks and citation omitted). "The claims must depend on a common contention 'of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Id.* (quoting *Wal-Mart*, 131 S. Ct. at 2551).  "The court's inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit, not on whether common questions are raised."  *Id.* (citing *Wal-Mart*, 131 S. Ct. at 2551).

The prerequisite of commonality is satisfied.  The putative Plaintiff Class alleges the identical Fourth Amendment claim arising from Defendants' challenged uniform practice of

14

searching and seizing their property absent a judicially-authorized warrant.  The proofs and questions necessary to establish Defendants' liability are common to the class.  Questions generating common answers include (1) whether the Treasury Department's standard policy, practice, and procedure allowing warrants to search and seize taxpayer property to be issued and executed absent judicial authority violates the Fourth Amendment; (2) whether the  Plaintiff Class' Fourth Amendment claims for damages are barred by the Eleventh Amendment; (3) whether Plaintiffs' and the putative class members' claims for injunctive relief are moot because the Michigan Treasury Department discontinued the challenged policy, practice, and procedure of using non-judicially authorized Warrants in July 2010 and replaced it in January 2011 with an official policy requiring a judicial order prior to executing a tax warrant; and (4) whether Defendant Dillon, who was not appointed State Treasurer until January 2011, can be found liable for alleged constitutional violations that occurred before his appointment.  As the Sixth Circuit recently observed in *Arlington Video*, although "class members may have been impacted differently," this does "not compel a finding of no commonality" when there are questions that "will generate common answers applicable to all class members."  2013 WL 560635  at *14.  And, as the Supreme Court recognized in *Wal-Mart*, Rule 23(a)(2) is satisfied if there is even a single common question.  *Wal-Mart*, 131 S. Ct. at 2556.  Plaintiffs here have shown that there are many.


### (3) Typicality

"The typicality test limits the class claims to those fairly encompassed by the named plaintiffs' claims.  The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class.  The representative's interests

must be aligned with those of the representative group such that the representative's pursuit of its own claims advances the interests of the class.  A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Arlington Video*, 2013 WL 560635 at *15 (internal quotations marks and citations omitted).

Rule 23(a)(3)'s typicality prerequisite is satisfied.  Plaintiffs' and the putative class members' Fourth Amendment claims arise from the same identical practice or course of conduct and are based on the same legal theory.  It is the absence of a judicially-authorized warrant that gives rise to their Fourth Amendment claims.  The proofs necessary to establish liability are common to the class, and the same, identical body of law will be applied to advance their identical Fourth Amendment claim.   Questions whether, as a result of Defendants' alleged constitutional violation, Plaintiffs or members of the putative class filed for bankruptcy, remained open or shut down, suffered damage to their business reputation, or had a substantial or relatively small amount of property seized all affect the issue of damages, not typicality.  *See id.* at *16.

### (4) Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.   To evaluate this requirement, courts review the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests

16

that are not antagonistic to one another." *Id.* (internal quotation marks and citations omitted).

Defendants do not dispute that class counsel are competent to conduct this litigation. Rather, they argue that Plaintiff Miri is not an adequate representative of the putative class. This Court disagrees and finds that this Rule 23(a) prerequisite is satisfied as well.

Plaintiffs and members of the putative class do not have interests that are antagonistic to one another. Plaintiffs, just like all members of the putative class, were taxpayers subjected to the same Michigan Treasury Department procedure that allowed a non-consensual search and/or seizure of their property without judicial authority. Plaintiffs, just like all members of the putative class, allegedly suffered the same injury -- a violation of their Fourth Amendment rights. Despite Defendants' arguments to the contrary, Plaintiffs are a part of the putative class they seek to represent, possess the same interests as the class, and suffered the same constitutional injury as each class member. Plaintiff Miri has had an active role in this lawsuit, personally experienced the practices and procedures challenged in this lawsuit, and is not a mere plaintiff-for-hire solicited by counsel.

In addition to showing that they satisfy the prerequisites of Rule 23(a), Plaintiffs must also show that they satisfy Rule 23(b)'s prerequisites.

### b. Rule 23(b)

Plaintiffs argue that a class may be certified under Rule 23(b)(1), Rule 23(b)(2), and Rule 23(b)(3). The Court will address the Rule 23(b)(3) arguments first.

### (1) Rule 23(b)(3)

To maintain a class action under Rule 23(b)(3), the Court must find that:

the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Plaintiffs argue that the economy of a class action greatly outweighs the value of allowing individuals to proceed on their own because a simple showing, subject to a single proof, is all that is required to establish liability on Plaintiffs' and the putative class members' identical Fourth Amendment claim -- that Defendants' standard practice of using non-judicially authorized warrants violates the Fourth Amendment and caused Plaintiffs' and each class member the same constitutional injury.  This Court agrees that allowing Plaintiffs to establish Defendants' liability to them would demonstrate Defendants' liability as to all putative class members.  *See Olden*, 383 F.3d at 508.  This Court also agrees with Plaintiffs that a class action is the superior method of adjudication because, in comparison to individual actions, it would provide significant economies of time, effort, and expense for litigants and the Court.  *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196 (6th Cir. 1988) (observing that "[t]he procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense.").

18

Many of Defendants' arguments that questions of law and fact common to the class do not predominate over individual questions have been addressed and rejected in the Court's discussion of Rule 23(a)'s commonality prerequisite. The remainder of Defendants' predominance arguments focus on damages, not liability, i.e., questions whether, as a result of Defendants' alleged constitutional violation, Plaintiffs or members of the putative class filed for bankruptcy, remained open or shut down, suffered damage to their business reputation, or had a substantial or relatively small amount of property seized.

As Justices Ginsburg and Breyer recently observed, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Comcast Corp. v. Behrend*, ___ U.S. ___, ___ S. Ct. ___, 2013 WL 1222646, *9 (S. Ct. Mar. 27, 2013) (Ginsburg and Breyer, J.J. dissenting opinion) (citing 2 W. Rubenstein, Newberg on Class Actions § 4:54, p. 205 (5th ed. 2012) and appellate decisions). In an abundance of caution, however, this Court will choose another available option -- certification of a class for liability purposes only. *See id.* at *9 n.* (observing that "at the outset, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings."). Affirming a district court's decision to certify a class of homeowners bringing personal and property damage claims against the owner of a cement manufacturing plant, the Sixth Circuit observed that the district court "can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method." *Olden*, 383 F.3d at 509.[2] This approach is authorized under Rule 23(c)(4), which provides that:

---

[2]The *Olden* court also rejected the defendant's concerns that bifurcation may deprive it of its Seventh Amendment rights particularly if a special master is used to determine

19

[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues.

Fed. R. Civ. P. 23(c)(4).

As discussed above, considering the nature of Plaintiffs' and the putative class members' identical Fourth Amendment claim, if Plaintiffs' establish liability as to one class member, it will succeed in establishing liability as to all other class members.[3]  This Court rejects Defendants' argument that class certification is not proper because individual Defendants may not have been personally involved in each challenged search and seizure. It is not disputed that the challenged Treasury Department policy of using non-judicially authorized warrants to search and seize taxpayer property was uniform, and all Treasury Department Warrant Officers were required to follow this policy.  Moreover, the Federal Rules of Civil Procedure allow Plaintiffs to freely amend their complaint to include additional Warrant Officers that discovery reveals took part in issuing or executing non-judicially authorized warrants during the applicable time period.  Thus, as discussed above, after liability is determined for the class, the amount of damages an individual Defendant may owe to an individual class member can be decided by a special master or by another method.

---

individual damages by observing that it suspected "that the plaintiffs will be more than willing to have a jury make that determination if that is truly the defendant's preference" and noting that "the parties can bridge that gap when it appears."  *Olden*, 383 F.3d at 509, n.6.

[3]As Plaintiffs' point out, consent to the Treasury Department searches of Plaintiffs' and the putative class members' properties is not an individual issue because Defendants have already produced a list of non-consensual searches and seizures, the class is defined to exclude consensual searches, and because service of the non-judicially authorized Treasury Warrant is a standard step in executing on the warrant.

Finally, this Court finds that a class action for liability purposes only is both a superior and manageable method of adjudication.  It will provide significant economies of time, effort, and expense for the litigants and the Court in light of the predominance of common questions of fact and law regarding liability.

The Court now considers the arguments that class certification is also proper under Rule 23(b)(2).

### (2) Rule 23(b)(2)

A class may be certified under Rule 23(b)(2) if Plaintiffs persuade the Court that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  As the Supreme Court observed in *Wal-Mart*, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.  131 S. Ct. at 2557 (internal quotation marks and citation omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

Plaintiffs argue that, because the conduct that they seek to have enjoined or have declared unlawful applies to the class as a whole, class certification under Rule 23(b)(2) is appropriate.  This Court agrees.  Defendants' arguments that class certification seeking injunctive or declaratory relief is inappropriate are rejected.  First, as to Defendants' argument that Plaintiffs' request for injunctive relief is moot, this Court agrees with the

21

Magistrate Judge's earlier observation that there has been no "legal finding that the Treasury Department's practice, now voluntarily ceased, is not reasonably expected to recur."  (6/08/12 Order granting in part Pls.' Mot. to Compel at 7 n.3 [Doc. #19] citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000)).  Second, as to Defendants' argument that Plaintiffs' complaint does not allege a claim for declaratory relief, this Court observes that leave to amend is freely granted under Rule 15 thus allowing Plaintiffs to amend their complaint to add a claim for declaratory relief, i.e., a  judgment declaring that Defendants' uniform practice of using non-judicially approved tax warrants to search and seize taxpayer property during the relevant time period violated the Fourth Amendment.

Class certification is proper under Rule 23(b)(2).  In light of the indivisible nature of Plaintiffs' and each putative class member's identical claim of a Fourth Amendment violation, each individual class member would be entitled to the *same* injunction or declaratory judgment against Defendants.

Finally, the Court considers arguments regarding class certification under Rule 23(b)(1).

### (3) Rule 23(b)(1)

Plaintiffs also argue that class certification is proper under Rule 23(b)(1)(B).  This Court agrees.

Rule 23(b)(1)(B) provides that a class action may be maintained if Rule 23(a) is satisfied and if "adjudication with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their

interests."  Fed. R. Civ. P. 23(b)(1)(B).  When, as here, the putative class is challenging a uniform practice, there is a risk of inconsistent results for each potential plaintiff's suit, if forced to be brought separately, on a Fourth Amendment claim that is identical to all putative class members.  *See Reese v. CNH Am., LLC*, 227 F.R.D. 483, 489 (E.D. Mich. 2005) (certifying a class of plaintiffs seeking to enjoin the defendant's modification of the retiree benefits).  Defendants' arguments to the contrary have been addressed above and rejected.  (Defs.' Resp. at 16-17 arguing that Plaintiffs claims are not typical of the class, etc.)  Accordingly, class certification is proper under Rule 23(b)(1)(B).

## III.   Conclusion

For the above-stated reasons, Plaintiffs' motion for class certification is GRANTED IN PART.  The class defined by the Court will be certified for liability purposes only.  This Court also appoints Plaintiffs' counsel to serve as Co-Lead Class Counsel.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 14, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 14, 2013, by electronic and/or ordinary mail.

s/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol Hemeyer